No. 25-30213

# UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

Amanda Carter, Individually and real party in interest G.C.; Michael Carter,

*Plaintiffs – Appellees*

v.

Chad Dupuy, individually; Jason Ard, Sheriff, in his official capacity as the public entity responsible for LPSO,

*Defendants – Appellants*

On Appeal from the United States District Court for the
Middle District of Louisiana,
Case No. 3:23-cv-69-JWD-EWD
Honorable John W. deGravelles, District Judge, Presiding

## BRIEF OF PLAINTIFF-APPELLEE
## Amanda Carter

**BIZER & DEREUS, LLC**
*Attorneys for Plaintiff*
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Eva M. Kalikoff (LA # 39932)
eva@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

**CIRKIEL LAW GROUP, P.C.**
*Attorneys for Plaintiff*
Martin J. Cirkiel, Esq.
Texas Bar No. 00783829
1901 E. Palm Valley Blvd.
Round Rock, Texas 78664
marty@cirkielaw.com
T: 512-244-6658
F: 512-244-6014

i

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this appeal. These representations are made in order that the judges of this Honorable Court may evaluate possible disqualification or recusal.

Amanda Carter – Plaintiff-Appellee

Michael Carter – Former Plaintiff

Jason Ard – Defendant-Appellant

Chad Dupuy – Defendant-Appellant

Andrew D. Bizer – Counsel for Plaintiff-Appellee

Garret S. DeReus – Counsel for Plaintiff-Appellee

Eva M. Kalikoff – Counsel for Plaintiff-Appellee

Martin J. Cirkiel – Counsel for Plaintiff-Appellee

Druit G. Gremillion, Jr. – Counsel for Defendant-Appellant

Chad Dupuy, individually and Sheriff Jason Ard

By:/s/ Garret S. DeReus
**Garret S. DeReus**

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Amanda Carter opposed Defendant-Appellants' Motion for Summary Judgment and prevailed. The district court utilized established Fifth Circuit and Supreme Court precedent to deny Appellants' Motion for Summary Judgment. The district court determined that there are genuine disputes as to several material facts, and therefore Appellants are not entitled to summary judgment. In accordance with F.R.A.P. 34(2) and 5th Cir. R. 28.2.3, Ms. Carter submits that this Court can dispense with oral argument as the facts of this matter are clear.

## **<u>TABLE OF CONTENTS</u>**

**CERTIFICATE OF INTERESTED PERSONS**…………………………………..ii

**STATEMENT REGARDING ORAL ARGUMENT**………………………..iii

**TABLE OF CONTENTS**……………………………………………...iv

**TABLE OF AUTHORITIES**……………………………………………vi

**STATEMENT OF JURISDICTION**……………………………………..1

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**………………2

**STATEMENT OF THE CASE**……………………………………..……3

**SUMMARY OF THE ARGUMENT**…………………………………...17

**ARGUMENT**………………………………………………………20

**I.    STANDARD OF REVIEW**……………………………………..20

**II.    MS. CARTER SUCCESSFULLY OVERCAME DEFENDANTS'
       QUALIFIED IMMUNITY DEFENSE**…………………………………..20**

**   a. Ms. Carter Defeats Qualified Immunity Under the Traditional Two
      Step Analysis**…………………………………………………21

**   i. <u>Ms. Carter's Right To Be Free From Excessive Force Was Clearly
      Established</u>**……………………………………………………21

**   ii. <u>Dupuy Violated Ms. Carter's Clearly Established Rights</u>**…………………24

**   b. The Clearly Established Prong Is Satisfied When a Similar Case is
      Available or Where Existing Precedent Placed the Lawfulness of the
      Conduct "Beyond Debate"**…………………………………….…28

**   c. No Emergency Required Dupuy to Make a Split-Second Decision**……..30

**III.   MS. CARTER WAS EXERCISING HER PARENTAL RIGHT TO
       PICK HER CHILD UP AT SCHOOL**……………………………..33**

IV.    **A REASONABLE JURY COULD CONCLUDE THAT DUPUY USED EXCESSIVE FORCE IN VIOLATION OF MS. CARTER'S FOURTH AMENDMENT RIGHTS**……………………………………………..36

    a.  **Ms. Carter's Injuries Are Cognizable And Caused Directly And Only by Dupuy's Excessive Force**………………………………………..37

    b.  **Dupuy's Excessive Use of Force Was Unreasonable**……………………38

V.    **MS. CARTER CAN PROCEED WITH HER STATE LAW CLAIMS**……………………………………………………………..40

    a.  **The District Court Properly Sustained Ms. Carter's State Law Claim for Negligent Use of Excessive Force**……………………………………40

    b.  **Defendants Are Liable to Ms. Carter For Assault and Battery Because Deputy Dupuy Used Excessive Force**……………………………………42

    c.  **The District Court Properly Sustained Ms. Carter's *Respondeat Superior* Claim Against Sheriff Ard**……………………………………..43

VI.    **QUALIFIED IMMUNITY IS CONTRARY TO THE "NOTWITHSTANDING CLAUSE" OF THE ORIGINAL TEXT OF SECTION 1983**……………………………………………………44

    a.  **The Original Version of Section 1983 Contained a "Notwithstanding Clause" that Does Not Appear in Today's U.S. Code**…………………..44

    b.  **The removal of the "Notwithstanding Clause" in the Revised Statutes of 1874 did not change the substance of the law**…………………………..50

**CONCLUSION**………………………………………………………..54

**CERTIFICATE OF SERVICE**…………………………………………..56

**CERTIFICATE OF COMPLIANCE**……………………………………..56

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abshire v. Livingston Parish*,
  2023 WL 3589657 (M.D. La. May 22, 2023) .................................. 14, 44, 54

*Anderson v. Creighton*, 483 U.S. 635 (1987) ...........................................21

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ................................... 20, 21, 28

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) ......................45

*Banks v. Herbrich*, 90 F.4th 407 (5th Cir. 2024) .....................................35

Barnes v. Felix, 145 S. Ct. 1353 (2025) ...................................................39

*Benavides v. Nunez*, 2025 WL 1943949 (5th Cir. July 16, 2025) ..........................26

*Booker v. S.C. Dep't of Corr.*, 855 F.3d 533 (4th Cir. 2017).................................30

*Bostock v. Clayton County*, 590 U.S. 644 (2020) ....................................48

*Brasseaux v. Town of Mamou,* 1999-1584 (La. 1/19/00), 752 So. 2d 815.............43

*Briscoe v. Lahue*, 460 U.S. 325 (1983)...................................................46

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ....................................... 21, 29

*Browder v. City of Albuquerque*, 787 F.3d 1076 (10th Cir. 2015).........................29

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) ...........................................46

*Buehler v. Dear*, 27 F.4th 969 (5th Cir. 2022).................................... 13, 25

*Burge v. Par. of St. Tammany*, 187 F.3d 452 (5th Cir. 1999)....................................1

*Crittindon v. LeBlanc*, 37 F.4th 177 (5th Cir. 2022).................................... 11, 13, 37

*Darden v. City of Fort Worth, Texas*, 880 F.3d 722 (5th Cir. 2018)......................25

*Dean for & on behalf of Harkness v. McKinney*, 976 F.3d 407 (4th Cir. 2020) ... 30, 32

*Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009) ...................... 12, 20, 22, 25, 37

*Evett v. DETNTFF*, 330 F.3d 681 (5th Cir. 2003) ...................................................31

*Flores v. City of Palacios*, 381 F.3d 391 (5th Cir. 2004) .......................................37

*Freeman v. Gore*, 483 F.3d 404 (5th Cir. 2007) ............................................. 14, 36

*Gates v. Texas Dep't of Protective & Regul. Servs.*, 537 F.3d 404 (5th Cir. 2008) 34

*Graham v. Connor*, 490 U.S. 386 (1989) ...............................................................17

*Graham v. O'Connor*, 490 U.S. 386 (1989) ...........................................................23

*Griggs v. Brewer*, 841 F.3d 308 (5th Cir. 2016).............................................. 20, 32

*Hanks v. Rogers*, 853 F.3d 738 (5th Cir. 2017) ............................. 12, 13, 22, 25, 37

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ...........................................................45

*Harvey v. City of Eunice Police Dep't*, 2010-1228 (La. App. 3 Cir. 4/6/11), 62 So. 3d 290 ....................................................................................................................40

*Hoggard v. Rhodes*, 141 S. Ct. 2421 (2021).............................................................30

*Hyde v. City of Willcox*, 23 F.4th 863 (9th Cir. 2022).............................................32

*Ikerd v. Blair*, 101 F.3d 430 (5th Cir. 1996).........................................................37

*Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306 (M.D. La. 2022).............. 15, 40

*Imbler v. Pachtman*, 424 U.S. 409 (1976) ..............................................................46

*Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855 (8th Cir. 2021) ...............................................................................................................................32

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968)..................................................53

*Jones v. Treubig*, 963 F.3d 214 (2d Cir. 2020).........................................................31

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018).................................................................46

*Kyle v. City of New Orleans*, 353 So.2d 969 (La. 1977) ...........................................41

*Lawson v. Straus*, 95-1537 (La. App. 4 Cir. 3/14/96), 673 So. 2d 223 ..................42

*Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94), 646 So. 2d 318 .............41

*McMurry v. Weaver*, 2025 WL 1778670 (5th Cir. June 27, 2025) .........................29

*Miller v. Vill. of Hornbeck*, 2010-1539 (La. App. 3 Cir. 5/11/11), 65 So. 3d 784 ..42

*Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011) ..................................................20

*Mullenix v. Luna*, 577 U.S. 7 (2015) ........................................................................31

*Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015)...................................................32

*Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012)....................................................24

*NLRB v. SW Gen., Inc.*, 137 S. Ct. 929 (2017) ........................................................49

*Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Va.*,
     464 U.S. 30 (1983).........................................................................................45

*Patton v. Self*, 2006-1029 (La. App. 3 Cir. 3/7/07), 952 So. 2d 874 .....................42

*Pearson v. Callahan*, 555 U.S. 223 (2009)...............................................................20

*Pierson v. Ray*, 386 U.S. 547 (1967) .................................................................. 14, 45

*Plumhoff v. Rickard*, 572 U.S. 765 (2014)........................................................ 28, 30

*Poole v. City of Shreveport*, 691 F.3d 624 (5th Cir. 2012)......................................25

*Procunier v. Navarette*, 434 U.S. 555 (1978)..........................................................46

*Reavis v. Frost*, 967 F.3d 978 (10th Cir. 2020) ....................................................32

*Reedy v. Evanson*, 615 F.3d 197 (3d Cir. 2010) ..................................................31

*Reitz v. Woods*, 85 F.4th 780 (5th Cir. 2023)........................................................31

*Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 211 L.Ed.2d 164 (2021).....................21

*Rogers v. Jarrett*, 63 F.4th 971 (5th Cir.) ..................................................54

*Salazar v. Molina*, 37 F.4th 278 (5th Cir. 2022)....................................................21

*Santosky v. Kramer*, 455 U.S. 745 (1982) ..........................................34

*Saucier v. Katz*, 533 U.S. 194 (2001) ..........................................30

*Scott v. Battle*, 688 Fed.Appx. 674 (11th Circ. 2017) ............................................32

*Smith v. Finkley*, 10 F.4th 725 (7th Cir. 2021) ......................................................32

*Solis v. Serrett*, 31 F.4th 975 (5th Cir. 2022)........................................................25

*Stephan v. United States*, 319 U.S. 423 (1943)......................................................50

*Stroik v. Ponseti*, 96-2897 (La. 9/9/97), 699 So. 2d 1072 ...........................40

*Strother v. Lucas*, 37 U.S. 410 (1838) ................................................48

*Swint v. Chambers County Com'n*, 514 U.S. 35 (1995) ...........................................1

*Tarver v. City of Edna*, 410 F.3d 745 (5th Cir. 2005) ............................................36

*The Civil Rights Cases*, 109 U.S. 3 (1883) ..........................................53

*Trammell v. Fruge*, 868 F.3d 332 (5th Cir. 2017) ..................................................25

*Tutrix on behalf of DCJH v. Travis*, 595 F. Supp. 3d 488 (M.D. La. 2022) ..........43

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439 (1993) .....50

*United States v. Texas*, 507 U.S. 529 (1993) ................................................... 44, 45

*United States v. Welden*, 377 U.S. 95 (1964) ................................................ 50, 52

*Watkins v. Gautreaux,*, 515 F. Supp. 3d 500 (M.D. La 2021)................................41

*Watt v. Alaska*, 451 U.S. 259 (1981)...........................................................................52

*Western Union Telegraph Co. v. Call Pub. Co.,* 181 U.S. 92 (1901) ....................48

*Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834)........................................................48

*White v. Pauly,* 137 S.Ct. 548 (2017) .......................................................................28

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) .........................................46

*Wooley v. City of Baton Rouge*, 211 F.3d 913 (5th Cir. 2000)...............................34

*Zadeh v. Robinson*, 928 F.3d 457 (5th Cir. 2019)....................................................54

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)..................................................................46

## **Statutes**

28 U.S.C. § 1291 ..........................................................................................................1

42 U.S.C. § 1983 ........................................................................................................46

Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871)....................................47

## **Other Authorities**

2 Cong. Rec. 129 (1873) ...........................................................................................51

2 Cong. Rec. 4220 (1874) .........................................................................................51

2 Cong. Rec. 646 (1874) ...........................................................................................51

*A New Dictionary of the English Language 1351* (1837)........................................49

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*,
    111 Calif. L. Rev. 201 (2023)........................................................... 47, 49, 52

Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45, 55-57 (2018) .......46

*Bryan A. Garner, Garner's Modern English Usage* 635 (4th ed. 2016)................48

Complete Dictionary of the English Language 894 (Webster's 1886) ..................49

*Etymological Dictionary of the English Language* 344 (Chambers's 1874) ..........49

Ralph H. Dwan & Ernest R. Feidler, *The Federal Statutes—Their History and
    Use*,22 Minn. L. Rev. 1008 (1938)......................................................... 50, 51

Schwartz, Joanna C., *The Case Against Qualified Immunity*,
    93 Notre Dame L. Rev. 1797, 1801-1802 & nn.24- 26 (2018)....................46

Shawn G. Nevers & Julie Graves Krishnaswami, *The Shadow Code: Statutory Notes
    in the United States Code*, 112 L. Library J. 213 (2020) ....................................50

## **Rules**

FED. R. CIV. P. 56(a) ...............................................................................20

# STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction as to Ms. Carter's § 1983 claim pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367. The district court issued an Order on March 24, 2025, denying in part and granting in part Defendant-Appellants' Motion for Summary Judgment. ROA.597.

The district court's denial of Defendant-Appellants' Motion for Summary Judgment as to the defense of qualified immunity invokes the collateral order doctrine. *Burge v. Par. of St. Tammany*, 187 F.3d 452, 476 (5th Cir. 1999) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995)). This Court has jurisdiction pursuant to 28 U.S.C. § 1291. *Swint*, 514 U.S. at 41-42 ("The collateral order doctrine is best understood not as an exception to the 'final decision' rule laid down by Congress in § 1291, but as a 'practical construction' of it").

**<u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>**

The following issues are currently before the Court:

1.    Whether the district court properly found that a reasonable jury could conclude that Dupuy employed unreasonable and excessive force against Ms. Carter.

2.    Whether the district court properly found that Ms. Carter overcomes qualified immunity, given that Dupuy had reasonable warning that his conduct violated Ms. Carter's constitutional rights.

3.    Whether, alternatively, qualified immunity should be abrogated as a defense to Ms. Carter's excessive force claim based on the original statutory intent of Section 1983 and the "Notwithstanding Clause"?

## **STATEMENT OF THE CASE**

Amanda Carter sued Defendant Chad Dupuy individually for excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983 and for assault, battery, and negligence under Louisiana state law. ROA.562. Ms. Carter also sued Sheriff Jason Ard in his official capacity as the public entity responsible for Livingston Parish Sheriff's Office ("LPSO") for claims of *respondeat superior* and negligent screening and training.[1] ROA.562. Appellants filed a Motion for Summary Judgment, and defendant Dupuy invoked the defense of qualified immunity and argued that his use of force was not excessive or unreasonable. The district court largely denied the Appellants' Motion for Summary Judgment, ruling that "a reasonable jury could conclude… that Dupuy used excessive and unreasonable force against Mrs. Carter, which resulted in a cognizable injury," Dupuy is not entitled to qualified immunity, and Ms. Carter's state law claims (with the exception of the claim for negligent screening and training against Sheriff Ard) survive. ROA.562-63. The district court further granted summary judgment as to a Fourteenth Amendment claim that Ms. Carter had alleged out of an abundance of caution. ROA.591.

---

[1] This lawsuit originally included claims against the Livingston Parish School Board, which were settled as part of the administrative proceedings brought pursuant to the Individuals with Disabilities Education Act ("IDEA").

1.     Ms. Carter's minor daughter, G.C., has cerebral palsy, is developmentally disabled and non-verbal. ROA.563. In 2022, G.C. was a student at Live Oak High School ("Live Oak"). *Id*. On February 4, 2022, an individual from the Louisiana Department of Children and Family Services ("DCFS") arrived at Ms. Carter's home to investigate a claim of child abuse involving G.C. *Id*. Ms. Carter had been raising issues with G.C.'s treatment at Live Oak and suspected that someone there had reported Ms. Carter to DCFS to be "vindictive." ROA.563-64. Ms. Carter and her husband, Michael Carter, declined to speak with the DCFS agent and left their home to pick G.C. up from Live Oak. ROA.563-64.[2] At no point during or after the visit from DCFS were the Carters provided with any court order or warrant authorizing G.C.'s removal from their custody. ROA.564.

Ms. Carter called the Livingston Parish Sheriff's Office on her way to Live Oak, requesting that an officer meet her at the school so she could file a complaint against a teacher. ROA.564. A DCFS agent contacted Live Oak and advised that the Carters were on their way to the school to pick up G.C. and instructed Live Oak not to release G.C. to her parents. ROA.564. Following this call from DCFS, Live Oak staff began to lock the doors of the school to prevent the Carters from entering. ROA.564. Assistant Principal Gary Jones received no documentation or court order

---

[2] Though Michael Carter was a Plaintiff in the original Complaint, he was removed as a Plaintiff with the filing of the First Amended Complaint.

authorizing the school to withhold G.C. from the Carters beyond the verbal instruction during his phone call with DCFS. ROA.565. Assistant Principal Gary Jones contacted Chad Dupuy, who was the School Resource Officer, stating "We have a problem in the front office. You need to come up here just – so I can tell you what's going on." ROA.564. Dupuy also learned from an LPSO dispatcher that a parent was coming to the school to file a complaint against a teacher. ROA.564.

Dupuy testified that before Ms. Carter arrived at the school, he had heard second hand that DCFS had spoken to the Assistant Principal and told the school not to release G.C. to the Carters "due to issues at the home, and [DCFS] were refused to be let into the home." ROA.565. Dupuy had also heard second hand that "DCFS was on their way to the school to get [the child], and DCFS said that the parents left the house and [were] on their way to the school to get her, but were… instructed by DCFS not to release her to the parents." ROA.565.

Vice Principal Jones testified that although he and other school administrators began locking the doors to Live Oak to prevent Ms. Carter from entering, Ms. Carter arrived at Live Oak and entered the unlocked office. ROA.565. Mr. Carter testified that Dupuy pulled into the school parking lot behind the Carters. ROA.565. Ms. Carter entered the school office while Dupuy and Mr. Carter stood outside. ROA.565. There is surveillance footage of the incident showing one view of the front door of the office from inside the office. ROA.565.

Ms. Carter told the secretary in the office that she would be checking G.C. out of school. ROA.566. The secretary told Ms. Carter that DCFS had directed the school not to release G.C. to her parents. ROA.566. Ms. Carter expressed concern that the school was kidnapping G.C. and holding her hostage. ROA.566.

Ms. Carter was on the phone with her grandmother, Virginia Ford, while she stood in the school office. ROA. 565. Vice Principal Jones testified that Ms. Carter yelled and used profanity, although Ms. Carter disputes that he was even present in the office at the same time to observe her behavior. ROA.566-567. Ms. Carter only observed the office secretary and another one or two school employees, not Mr. Jones, when she was in the school office that day. ROA.566-67. Ms. Carter admits that she used a swear word once, when she stated "They won't give me my fucking daughter," to her grandmother on the phone. ROA.566. Ms. Carter spoke to the office secretary solely about picking up G.C. from school. ROA.566. Ms. Carter denies that she raised her voice at all in the school office. ROA.567.

Ms. Carter provides that there are factual disputes as to who was present in the school office, whether Ms. Carter raised her voice, and whether she used more than a single, fleeting profanity. ROA.567. Further Ms. Carter alleges that Mr. Jones has no personal knowledge of what happened while she was in the school office. ROA.567. The district court found the surveillance video from inside the office inconclusive, as there is no audio and it is unknown whether Ms. Carter yelled or

used more than one swear word. ROA.567. Further, the district court concluded that "[Ms. Carter's] body language reflects that she is upset, but it does not appear that she is uncontrollable, unruly, or yelling." ROA.567.

It is undisputed that when the Carters arrived at Live Oak, Dupuy had not seen any court order or warrant prohibiting the Carters from picking up G.C. ROA.567. Dupuy did not speak to anyone from DCFS before he engaged with the Carters. ROA.567. Dupuy stood outside the school office, outside of earshot of the conversation inside the office, while Ms. Carter spoke to the secretary about picking up her daughter from school. ROA.567.

The secretary told Ms. Carter to leave the office if she was going to continue using profanity. ROA.567. Ms. Carter then opened the office doors and asked Mr. Carter to enter the office. ROA.567. The school secretary then mouthed something to Dupuy from 20 to 25 feet away. ROA.567. Dupuy believes the secretary said "Hey, she has got to go," though he could not hear what she said. ROA.568. Mr. Jones testified that the secretary requested Dupuy remove Ms. Carter from the office. ROA.568.

Ms. Carter disputes whether Mr. Jones saw or heard what the secretary said to Dupuy in the school office. ROA.568. Ms. Carter also disputes whether Dupuy could have seen the secretary mouthing something given the distance between them and that the secretary is not visible in the surveillance video during Ms. Carter's

interaction with Dupuy. ROA.568. The district court agreed with Ms. Carter "that fair inferences from the video are that (1) Jones entered late and never saw or heard the secretary and (2) Dupuy may not have seen the secretary." ROA.568.

It is undisputed that Dupuy asked Ms. Carter to step outside and she refused to do so without first being allowed to pick up her daughter from school. ROA.568. Dupuy testified that all he knew was that DCFS had told the school not to release G.C. to her parents. ROA.568. Dupuy did not engage with Ms. Carter about why she wanted to pick up G.C. or why she was not allowed to pick up G.C. ROA.568. Dupuy did not tell Ms. Carter that she was under arrest or that if she refused to leave the school office, she would be arrested. ROA.568. No one told Ms. Carter that she was forbidden from being in the school. ROA.568-9.

Less than twenty seconds after Dupuy first engaged with Ms. Carter, Dupuy grabbed and pulled her right arm to physically remove her from the school office. ROA.569. Ms. Carter braced herself and planted her feet down to stay in place. ROA.569. Dupuy then shoved Ms. Carter with both hands to fully force her outside of the school office. ROA.569.

Dupuy testified that Ms. Carter was not under arrest or attempting to flee or resist arrest. ROA.569. Ms. Carter did not have a weapon with her, and she did not threaten to use a weapon or any violence. ROA.569. Dupuy testified that he was not

threatened with a weapon at all that day. ROA.569. Though Dupuy testified he was threatened, "he does not specify how or by whom." ROA.569.

Dupuy then handcuffed and put Ms. Carter in the back of his unit. ROA.569. Ms. Carter requested medical attention because she was in pain from where Dupuy grabbed her arm. ROA.569. Dupuy called Acadian Ambulance and Ms. Carter was examined at the scene. ROA.569. The Carters both testified that Dupuy told them that if Ms. Carter went to the hospital that day, on a Friday, she would not be able to take care of her disabled daughter because she would not be able to bond out of jail until Monday. ROA.569. Dupuy testified that he told Ms. Carter that if she went to the hospital, he would go with her and then arrest her and book her in jail upon her release from the hospital. ROA.569-70. Ms. Carter did not go to the hospital and Dupuy did not bring her to jail. ROA.570.

Instead, Dupuy spoke to an LPSO supervisor and issued Ms. Carter a summons for violations of La. R.S. § 14:103, Disturbing the peace, and La. R.S. § 14:63.3, Entry on or remaining in places or on land after being forbidden. ROA.570. The charges were dropped without prosecution. ROA.570. Dupuy never spoke to anyone from DCFS that day and G.C. was released to the Carters that day. ROA.570. Dupuy never viewed an order from DCFS or a court authorizing the school to keep G.C. from her parents' custody. ROA.570. Because there was none.

Ms. Carter went to urgent care twice to treat injuries stemming from Dupuy's use of force. ROA.570. She went to urgent care for the bruise on her upper arm on February 5, 2022, where she was diagnosed with contusions and told not to lift anything heavy. ROA.570. She was given a steroid, a muscle relaxer, and pain medication. ROA.570.

Ms. Carter then went to urgent care again on February 6, 2022 due to swelling, soreness, and tingling in her right wrist. ROA.570. An x-ray showed that her wrist was not broken, but she was put in a splint. ROA.570. Ms. Carter had bruising and soreness in her upper arm for two weeks, and about a month of tingling and coldness in her wrist. ROA.570. Ms. Carter documented her bruising with photos. ROA.570-71.

Ms. Carter experienced mental and emotional injuries due to the use of force by Dupuy. ROA.572. Ms. Carter has become anxious and withdrawn, staying home more frequently. ROA.572. She has lost faith in law enforcement's ability to protect her, which was part of her fundamental belief system before this incident. ROA.572. Mr. Carter testified that his wife is different from who she was before Dupuy's use of force. ROA.572.

2.    On February 3, 2023, Ms. Carter filed suit, bringing claims against Appellants under 42 U.S.C. § 1983 and Louisiana state law claims for negligence. In her First Amended Complaint filed on August 7, 2023, Ms. Carter maintained her

claims against Appellants pursuant to 42 U.S.C. § 1983 for violations of her 4th Amendment and 14th Amendment rights, and Louisiana state law claims for negligence, assault and battery. Following discovery, Appellants moved for summary judgment on August 22, 2024.

The district court denied Appellants' motion for summary judgment in most respects. The district court ruled that Ms. Carter overcame Appellants' qualified immunity defense under the traditional two-step analysis. ROA.587. The two steps, as articulated in *Crittindon v. LeBlanc*, 37 F.4th 177, 185-86 (5th Cir. 2022), are 1) whether the officer's alleged conduct violated a federal right, and 2) whether the right in question was clearly established at the time of the alleged violation. ROA.574. The district court found that "considering how strongly the *Graham* factors weigh in Plaintiffs' favor… Dupuy had 'reasonable warning that [his] conduct… violated constitutional rights'" ROA.590 (quoting *Crittindon*, 37 F.4th at 186).

In denying Appellants' Motion for Summary Judgment, the district court further found that "a reasonable jury could easily conclude that Dupuy employed unreasonable and excessive force against Mrs. Carter and that he had fair notice that his conduct was unlawful under clearly established law." ROA.587. The district court applied the *Graham* factors: "'The severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether

he is actively resisting arrest or attempting to evade arrest by flight.'" ROA.584 (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (citations omitted)).

Here, the district court found that the violations that Ms. Carter was charged with, disturbing the peace and entry on or remaining in a place after being forbidden, are minor crimes for which the charges were ultimately dismissed. ROA.587. Second, a reasonable jury could conclude that Ms. Carter did not pose an immediate threat to the safety of Dupuy or others. ROA.587. Dupuy testified that he was not threatened with a weapon, and though he says he was verbally threatened a few times, he does not specify how or by whom. ROA.587-88. Third, "a reasonable jury could easily conclude that the minimal resistance Mrs. Carter displayed was more appropriately characterized as 'passive resistance.'" ROA.588.

In applying the *Graham* factors, the district court analyzed the facts as parallel to the fact patterns in two similar cases, *Hanks v. Rogers*, 853 F.3d 738 (5th Cir. 2017) and *Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009). In *Hanks*, all three *Graham* factors strongly favored the plaintiff where 1) the officer stopped the plaintiff for a minor traffic offense, 2) the officer immediately aimed his taser at the plaintiff's back while plaintiff stood against his vehicle facing away from the officer, with empty hands behind his back presenting no threat or flight risk, and 3) the plaintiff at most passively resisted the officer by asking whether he was under arrest. ROA.586. The passive resistance demonstrated by the plaintiff in *Hanks* was

"'remaining on his feet for about twenty seconds after [the officer's] first order to kneel' and taking a 'small lateral step with his left foot' either before or simultaneously with the use of force…" ROA.586 (quoting *Hanks*, 853 F.3d at 746). In *Deville*, the *Graham* factors also warranted a denial of qualified immunity where 1) the case involved a minor traffic offense without probable cause, 2) the officers beat on the car window with a heavy flashlight and broke the window, roughly extracting the plaintiff from the vehicle, and 3) the plaintiff demonstrated passive resistance to being separated from her grandchild and removed from the vehicle. ROA.586-87.

The district court found that "Mrs. Carter's extraordinarily minor feet planting is [ ] comparable to *Deville*" and "similar to *Hanks*." ROA.589. Further, "Dupuy's use of force did not involve 'measured and ascending responses to a suspect's noncompliance.'" ROA.589 (quoting *Buehler v. Dear*, 27 F.4th 969, 984 (5th Cir. 2022). The similarity of the use of force by Dupuy against Ms. Carter and the facts in *Hanks* and *Deville*, weighed heavily toward the district court finding "that Dupuy had 'reasonable warning that [his] conduct… violated constitutional rights." ROA.590 (quoting *Crittindon*, 37 F.4th at 186).

Further, the district court found that "a reasonable juror could conclude from the evidence in the record…that Mrs. Carter suffered injuries which 'resulted

directly and only from a use of force that was clearly excessive.'" ROA.591 (quoting *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007)).

3.      Ms. Carter argues that the doctrine of qualified immunity should be invalidated as to Section 1983, pursuant to the original text of the statute as passed by Congress. ROA.231. In *Pierson v. Ray*, 386 U.S. 547, 557 (1967), the Supreme Court assumed that Congress intended to retain common law principles in actions under Section 1983. ROA.229-30. The original language of Section 1983, as passed by Congress as part of the Ku Klux Klan Act of 1871 including a "notwithstanding clause" which made government officials liable for constitutional violations "notwithstanding" and contrary common-law principles. ROA.231-33. Though the "notwithstanding clause" was removed in the Revised Statutes of 1874, the explicit intent of Congress was to not change the substantive provisions of the law. ROA.236. As such, Ms. Carter argues that qualified immunity should not be applied to Section 1983 claims as consistent with the statutory intent and original text of Section 1983. ROA.237.

The district court rejected Ms. Carter's argument and cited to its opinion in a prior case, *Abshire v. Livingston Parish*, No.22-548, 2023 WL 3589657 (M.D. La. May 22, 2023). In *Abshire*, the district court offered that "this Court's own feelings toward qualified immunity are ultimately irrelevant; Plaintiffs' arguments are best left for the Supreme Court or the Fifth Circuit sitting en banc, not for a district court."

14

*Id*. at *10; ROA.591. As such, the district court declined to invalidate qualified immunity as a viable defense.

Ms. Carter provides this argument as alternative grounds to support the district court's ruling, based on the original statutory language of Section 1983 and the improper interpretation by the Supreme Court in 1967.

4.      The district court ruled that Ms. Carter's state law claims survive on summary judgment, "largely for the reasons given for the federal excessive force claim." ROA.595. Using the same language and analysis from its ruling in *Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 381-83 (M.D. La. 2022), the district court concluded:

> In sum, looking at the totality of the circumstances from the facts presented by Plaintiffs, a reasonable factfinder could conclude that the arresting officers employed 'clearly inappropriate' force to [Mrs. Carter]. Consequently, Defendants' motion will be denied.

ROA.595.

The district court further denied summary judgment as to dismissal of Ms. Carter's claims against Sheriff Ard for vicarious liability. ROA.596. It is undisputed that Dupuy was acting in the course and scope of his employment for Sheriff Ard and LPSO when the incident occurred. ROA.596. "Because there are questions of fact on Dupuy's liability, there are also questions of fact on Plaintiffs' vicarious liability claim against Sheriff Ard." ROA.596.

5.      On April 8, 2025, Appellants filed a notice of appeal. ROA.598. On June 18, 2025, Appellants filed their opening brief. Ms. Carter obtained an extension to file her response brief. Now, Ms. Carter files her timely response brief. Ms. Carter respectfully requests that the district court's judgment be sustained in all respects.

## SUMMARY OF THE ARGUMENT

The district court properly denied Defendant-Appellants' Motion for Summary Judgment. Ms. Carter has overcome Appellants' qualified immunity defense.

Ms. Carter defeated Appellants' qualified immunity defense under the traditional two-step analysis. First, Ms. Carter's right to be free from excessive force was clearly established. Second, Dupuy violated Ms. Carter's clearly established right. A reasonable jury could conclude that Ms. Carter's rights were clearly established and Dupuy's conduct violated Ms. Carter's clearly established rights.

In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court articulated three factors to weigh in determining the reasonableness of force: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to flee. A reasonable jury could conclude, applying these three factors, Dupuy's use of force against Ms. Carter was unreasonable.

Ms. Carter's right was clearly established under existing case law involving similar facts to her case. Further, courts have held that where the right is sufficiently obvious, no parallel case law is necessary to clearly establish the existence of the right. Here, Ms. Carter's clearly established right to be free from excessive force was obvious.

Further, there was no emergency requiring Dupuy to make a split-second decision, which would have justified his use of force against Ms. Carter.

Ms. Carter was exercising her parental right to pick her non-verbal developmentally disabled daughter up at school and given the absence of any court order or warrant disallowing her from doing so, Dupuy interfered with that right.

A reasonable jury could conclude that Dupuy used excessive force in violation of Ms. Carter's Fourth Amendment rights. Ms. Carter's injuries to her arm and wrist and her emotional distress are cognizable. The injuries exceed de minimis harm here. The injuries were caused only and directly by Dupuy's use of force.

Dupuy's use of force was unreasonable in the moment given the information available to him about the lack of threat that Ms. Carter posed, and the lack of information about any underlying criminal activity. The unreasonableness was evident in the moment, even without 20/20 hindsight.

For the same underlying reasons that Ms. Carter's federal claims were sustained on summary judgment, Ms. Carter's state law claims survive. There is no dispute that Dupuy was acting in the course and scope of his employment at the time of his use of force, and therefore, the *respondeat superior* claims against Sheriff Ard also survive.

Further, there are alternative grounds to sustain the district court's ruling denying qualified immunity. Ms. Carter argues that the "Notwithstanding Clause"

that was originally included in the statutory language of Section 1983, supports removing qualified immunity as a defense.

# ARGUMENT

## I.    STANDARD OF REVIEW

The Court of Appeals reviews de novo the district court's resolution of legal issues on a motion for summary judgment on the basis of qualified immunity. *Griggs v. Brewer*, 841 F.3d 308, 311 (5th Cir. 2016). "Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. at 311-12; FED. R. CIV. P. 56(a). "On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Deville*, 567 F.3d 156, 164.

## II.    MS. CARTER SUCCESSFULLY OVERCAME DEFENDANTS' QUALIFIED IMMUNITY DEFENSE

Qualified immunity is a doctrine which protects government officials from civil liability unless a plaintiff shows that the official violated a statutory or constitutional right, and the right was clearly established at the time of the official's conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Once a defendant raises qualified immunity as a defense, the plaintiff must prove that the official violated a statutory or constitutional right, and that the right was clearly established at the time. *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011). These two prongs of analysis for qualified immunity can be addressed in any sequence. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  A right is clearly established where the contours of that right

20

are sufficiently clear that every "reasonable official would understand that what he is doing violates that right." *Ashcroft*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Even if there is no body of case law on the appropriate use of force in the particular circumstances at issue, in an obvious case, the *Graham* excessive force factors "can 'clearly establish' the answer." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

### a. Ms. Carter Defeats Qualified Immunity Under the Traditional Two Step Analysis

The district court properly ruled that Dupuy is not entitled to qualified immunity here. Ms. Carter's right to be free from excessive and unreasonable force was clearly established at the time of the incident at issue. Dupuy plainly violated Ms. Carter's clearly established right when he used excessive force against her.

### i. Ms. Carter's Right To Be Free From Excessive Force Was Clearly Established

"A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. Although this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Salazar v. Molina*, 37 F.4th 278, 285 (5th Cir. 2022) (quoting *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 211 L.Ed.2d 164 (2021)).

In holding that a reasonable jury could find that Dupuy's use of force violated clearly established law, the district court looked to the facts in *Hanks* and *Deville*. ROA.586-87. In *Hanks* an officer stopped the plaintiff for driving below the speed limit on the interstate, ordering him to step out of his car and kneel on the ground. *Hanks*, 853 F.3d at 742. The plaintiff got out of the car but refused to kneel, even after the officer ordered him to do so multiple times. *Id.* The plaintiff asked the officer if he was being arrested, to which the officer did not respond. *Id*. The officer then shoved the plaintiff, pushing his upper body onto the trunk of his car. *Id*. at 743. Given that the traffic stop was for minor traffic violations and the plaintiff demonstrated only passive resistance by refusing to kneel, the officer "applied clearly excessive and unreasonable force" when he pushed the plaintiff onto the car. *Id*. at 746.

In *Deville*, the plaintiff was stopped for a minor traffic offense and demonstrated passive resistance. 567 F.3d at 169. The officer's escalation to smashing the car window and aggressively removing plaintiff from the vehicle was "sufficiently egregious to warrant a denial of qualified immunity." *Id*.

The district court held that Ms. Carter's passive resistance is comparable to *Hanks*, where the plaintiff remained on his feet for about twenty seconds after he was ordered to kneel, and then took a small step with one foot, without any other signs of violence or flight. ROA.589. The district court further noted that "Mrs.

Carter's extraordinarily minor feet planting is also comparable to *Deville*" where the plaintiff passively resisted the officer by refusing to leave her grandchild and exit the vehicle until someone else could come be with the child. ROA.589.

In determining the reasonableness of the use of force, courts weigh the three *Graham* factors: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Graham v. O'Connor*, 490 U.S. 386, 396 (1989). The district court found that all three *Graham* factors clearly weigh on the side of unreasonableness in Dupuy's use of force, much like in *Hanks* and *Deville*, indicating that Dupuy had reasonable warning that his conduct violated Ms. Carter's constitutional rights. ROA.590.

Ms. Carter's alleged violations were minor and non-violent. The misdemeanor charges of disturbing the peace and entry on or remaining in a place after being forbidden were dismissed without prosecution. Ms. Carter did not pose a threat to anyone around her. Though Appellants claim that Ms. Carter posed a "potential threat," **they do not cite any evidence at all** in their briefing on summary judgment to corroborate this assertion. ROA.155. The district court noted that Dupuy testified that no one threatened him with a weapon or brandished a weapon at him, but "he simply says he was threatened verbally a couple of times, though he does not say how or by whom." ROA.588.

Ms. Carter had a clearly established right to be free from excessive force at the time that Dupuy asked her to step outside of the school office. Dupuy's use of force against Ms. Carter was objectively unreasonable.

## ii.   Dupuy Violated Ms. Carter's Clearly Established Rights

Given that Ms. Carter's right to be free from excessive force was clearly established, Dupuy plainly violated her rights when he grabbed and forcibly shoved her to remove her from the Live Oak office. Because Ms. Carter has proven that Dupuy used excessive force through each of the *Graham* factors, the law was clearly established at the time of the incident. *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012) ("None of the *Graham* factors justifies [officer]'s tasering [plaintiff].... Therefore, taking the facts in the light most favorable to [plaintiff] at the summary judgment stage, the officers' conduct was objectively unreasonable in light of clearly established law at the time of the incident"). Ms. Carter was not posing a threat and did not raise her voice, which made the force unreasonable and excessive. All she wanted to do was pick up her non-verbal developmentally disabled daughter from school. The district court properly denied summary judgment for Appellants.

Where an individual "committed no crime, posed no threat to anyone's safety, and did not resist the officers or fail to comply with a command," use of force is objectively unreasonable. *See Newman*, 703 F.3d at 764. The Fifth Circuit has held that it is objectively unreasonable for officers to resort to use of force when an

arrestee is not demonstrating active resistance or attempting to flee. *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 731 (5th Cir. 2018).

The "speed with which officers resort to force" is an additional factor weighed in determining reasonableness of use of force. *Solis v. Serrett*, 31 F.4th 975, 983 (5th Cir. 2022). Courts also consider whether an officer's use of force involved "measured and ascending responses to a [suspect's] noncompliance." *Buehler v. Dear*, 27 F.4th 969, 984 (5th Cir. 2022) (citing *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012)). An officer's failure to engage or negotiate with an individual, opting instead to use force, weighs against reasonableness. *Deville*, 567 F.3d 156, 167-8.

An individual demonstrating passive resistance does not justify use of force. *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017). Use of force is unreasonable and therefore excessive, where an individual passively resists an officer's orders, poses no immediate threat, and is not fleeing the scene. *Hanks*, 853 F.3d 738, 746.

The district court also considered Dupuy's lack of measured and ascending responses to Ms. Carter's non-compliance. ROA.589. The district court emphasized that Dupuy grabbed Ms. Carter's arm less than twenty seconds after he first encountered her directly. ROA.562. The district court found that, like the officer in *Deville*, Dupuy did not engage or negotiate with Ms. Carter and instead quickly opted to "pull and shove" her. ROA.589. Dupuy did no investigation into why Ms.

Carter wanted to pick up her daughter and why she was unable to do so. Dupuy used physical violence against a mother whose non-verbal developmentally disabled daughter was being held without legal justification or basis.

Dupuy used excessive force through each of the Graham factors, indicating that the law was clearly established at the time of the incident. The district court properly concluded that "considering all of the evidence, again in a light most favorable to Plaintiffs with reasonable inferences drawn in their favor, a reasonable jury could easily conclude that Dupuy's use of force was objectively unreasonable and excessive." ROA.589. For that reason the district court properly concluded "that Plaintiffs have overcome qualified immunity." ROA.589.

Here, Appellants incorrectly state that "plaintiffs-appellees cannot come forward with any case law—much less any substantial body of law—that would establish that Deputy Dupuy's conduct… violated her right to be free from excessive force…" Appellants' Brief at 34. This statement is simply wrong. The district court relied heavily on *Hanks* and *Deville* when it held that Ms. Carter's right was clearly established, given the similar facts in those two cases.

Finally, the district court's ruling should not be disturbed on this interlocutory appeal because, given the factual disputes that are unresolved, the ultimate question of qualified immunity that must be resolved by the jury. *Benavides v. Nunez*, No. 24-20445, 2025 WL 1943949, at *3 (5th Cir. July 16, 2025) ("We are not allowed

to second guess the district court's determination that a genuine dispute of material fact exists. A jury must resolve the competing factual evidence and make the ultimate determination of qualified immunity."). Sensing this issue, Appellants argue that the factual disputes identified by Judge deGravelles are "irrelevant." Appellants' Brief at 37. Appellants argue it is irrelevant whether Ms. Carter was "yelling" because she "admitted to using profanity[.]" *Id.*

Whether Ms. Carter was yelling and "out of control," or simply used a fleeting one-time instance of profanity (aimed not at the Live Oak secretary, but at her grandmother over the phone), is highly material. There is a vast distance between an out-of-control individual and a person who uses a one-time swear word. A jury might conclude that use of force against the former is permissible. In contrast, there is no scenario where use of physical violence against an unarmed, non-threatening mother who just wants to pick up her child from school and fleetingly uses a swear word.

Appellants also argue that the dispute over what Mr. Jones told Dupuy is irrelevant because there is "no question" that DCFS instructed that Ms. Carter's daughter was not be released. First, what Mr. Jones told Dupuy is material because, unless Dupuy was told that DCFC had a warrant, then there was no basis to hold the child.

Even more critically, however, Appellants admit that DCFS merely instructed Ms. Carter's daughter "not be released" – but this instruction was purely an

administrative directive containing no threat assessment whatsoever. There is no evidence that DCFS characterized Ms. Carter as dangerous, violent, armed, or even uncooperative. The absence of any such characterization is itself material evidence that no reasonable officer could have perceived an immediate threat justifying physical force. Appellants cannot manufacture qualified immunity by conflating an administrative hold with a security threat.

### b. The Clearly Established Prong Is Satisfied When a Similar Case is Available or Where Existing Precedent Placed the Lawfulness of the Conduct "Beyond Debate."

Ms. Carter is not obligated to cite cases involving identical circumstances to demonstrate that the law was clearly established. In a qualified immunity analysis, the Supreme Court has stressed the need to "identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment." *White v. Pauly,* 580 U.S. ——, ——, 137 S.Ct. 548, 552 (2017) (*per curiam* ); *e.g., Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014). While there does not have to be "a case directly on point," existing precedent must place the lawfulness of the particular arrest "beyond debate." *al–Kidd, supra,* at 741.

In his Ruling and Order, Judge deGravelles conducted an extensive survey of Fourth Amendment case law and found similar cases that placed the unlawful nature of Dupuy's force against Ms. Carter beyond debate. The district court found that

"Mrs. Carter's extraordinarily minor feet planting is [ ] comparable to *Deville*" and "similar to *Hanks*." ROA.589.

Moreover, and solely in the alternative, Courts have routinely held that even where there is not a body of case law to undergird this "clearly established" prong of the analysis, it is not necessary where the right being violated is sufficiently obvious. The Supreme Court has held that, where the facts are so obvious that the *Graham* factors show the use of force was excessive, there is not a need to identify exactly parallel case law that clearly establishes the right. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). And there is a clear logic to that approach: an officer should not be shielded from suit where the clearly established right was *so obvious* that there is no case law available to show that the right was clearly established. Here, it was abundantly obvious that using physical violence against an unarmed mother attempting to pick her non-verbal developmentally disabled child up from school is unnecessary and excessive.

"It would make a mockery of our rights to grant qualified immunity just because no one in government has yet to be abusive enough to commit that particular violation—and then stubborn enough to litigate it…" *McMurry v. Weaver*, No. 24-50571, 2025 WL 1778670, at *7 (5th Cir. June 27, 2025) (Ho, J., concurring). Some things are so obviously unlawful that they do not require a detailed explanation. *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015). This is

particularly the case where the officer's actions infringe on "rights 'manifestly included within more general applications of the core constitutional principles invoked.'" *Dean for & on behalf of Harkness v. McKinney*, 976 F.3d 407, 419 (4th Cir. 2020) (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017).

### c.  No Emergency Required Dupuy to Make a Split-Second Decision

Courts are much more likely to hold that qualified immunity protects officers making split-second decisions when facing imminent threats to their safety or the safety of others, than when officers commit constitutional violations despite having time to further investigate and consider their options. The Supreme Court has explained that a proper analysis must "allow for the fact that police officers are often forced to make split- second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014); *see also, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (qualified immunity intended "to protect officers from the sometimes hazy border between excessive and acceptable force"). Justice Thomas differentiates between officers "who have time to make calculated choices about enacting or enforcing unconstitutional polices" and "a police officer who makes a split-second decision to use force in a dangerous setting." *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas. J., dissenting from denial of certiorari).

Excessive force cases often involve force used during high stakes and dangerous situations, such as a high-speed chase. *Mullenix v. Luna*, 577 U.S. 7, 14 (2015). These fact patterns involve a "hazy legal backdrop" where the officers and innocent bystanders are at risk of serious injury or death at the hands of the arrestee. *Id*.

This Court has suggested that there is a distance between cases where an officer must make a split-second decision and cases where there is time for deliberation. *Reitz v. Woods*, 85 F.4th 780, 792 (5th Cir. 2023) (quoting *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003)). Where an officer relies upon "miniscule information in an unhurried setting", they would appear to do so at their own risk. *Evett*, 330 F.3d 689 ("We cannot conclude that based on such minuscule information in an unhurried setting such as in this case, that arresting Evett was objectively reasonable.").

Courts of Appeal frequently apply qualified immunity by looking to urgency as a touchstone and expressly evaluating the public official's opportunity to consider different courses of action when deciding whether to grant immunity. *E.g.*, *Jones v. Treubig*, 963 F.3d 214, 236 (2d Cir. 2020) (officer had "a reasonable opportunity to re-assess" before using additional force); *Reedy v. Evanson*, 615 F.3d 197, 224 n.37 (3d Cir. 2010) ("qualified immunity exists, in part, to protect police officers in situations where they are forced to make difficult, split-second decisions . . . there

were no 'split-second' decisions made in this case"); *Dean v. McKinney*, 976 F.3d 407, 419-20 (4th Cir. 2020) (denying qualified immunity for an officer driving too fast when not in pursuit or responding to emergency); *Griggs v. Brewer*, 841 F.3d 308, 316 (5th Cir. 2016) (qualified immunity "designed to protect" split-second decisions); *Mullins v. Cyranek*, 805 F.3d 760, 766-67 (6th Cir. 2015) ("[Q]ualified immunity is available only where officers make split-second decisions in the face of serious physical threats to themselves and others."); *Smith v. Finkley*, 10 F.4th 725, 748 (7th Cir. 2021) ("The events and the speed at which they occurred here certainly implicates the qualified immunity defense..."); *Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 867 (8th Cir. 2021) (acknowledging the difference between split-second decisions and government actions that result from deliberation); *Hyde v. City of Willcox*, 23 F.4th 863, 872-73 (9th Cir. 2022) ("[W]e are generally loath to second guess law enforcement officers' actions in a dangerous situation . . . [b]ut here, [the officers] had two minutes to realize that" plaintiff did not pose a threat); *Reavis v. Frost*, 967 F.3d 978, 988 (10th Cir. 2020) (noting lack of immediate danger to anyone when denying qualified immunity); *Scott v. Battle*, 688 Fed.Appx. 674, 677 n.6 (11th Circ. 2017) (use of force was "not a split-second judgment but an act of frustration with what [the officer] perceived as [plaintiff's] intransigence").

Here, there was no emergency that required split-second decision making by Dupuy. There was no immediate threat to Dupuy's safety or anyone else at the school. Dupuy did very little investigation into why Ms. Carter was at the school, why the school secretary purportedly asked her to leave the school, and whether there was any order or warrant from DCFS or a court order as to custody of Ms. Carter's child. The information available to Dupuy necessitated further investigation, which would have been possible by simply asking some questions given the unhurried circumstances. Dupuy violated Ms. Carter's rights because he opted to use raw physical power against a mother seeking to retrieve her non-verbal developmentally disabled child from school. No reasonable officer would have opted to use injurious force against a mother attempting to pick up their child from school. For that reason among others, the district court's denial of Appellants' motion for summary judgment based on qualified immunity should be affirmed.

### III.    MS. CARTER WAS EXERCISING HER PARENTAL RIGHT TO PICK HER CHILD UP AT SCHOOL

When Dupuy used excessive for against Ms. Carter, she was exercising her well-established parental right to pick up her child from school. There was no court order or warrant which would have allowed any law enforcement officer or school official to prevent Ms. Carter from picking up her daughter that day. And yet, the school administration and staff sought to do just that when they deployed Dupuy to prevent Ms. Carter from retrieving her daughter. The importance of a mother's right

to have access to her child cannot be overstated here. If Dupuy had taken a moment to investigate the facts, he would have understood that the true threat was Live Oak's withholding of Ms. Carter's non-verbal developmentally disabled daughter without the legal right to do so. If Dupuy had simply listened to Ms. Carter's concerns about her daughter being kidnapped, he would have understood that Ms. Carter was in fact the victim in the situation.

"A biological relationship traditionally has given rise to familial expectations that are 'venerable and [ ] deserving of constitutional protection.'" *Wooley v. City of Baton Rouge*, 211 F.3d 913, 923 (5th Cir. 2000). Parents have a fundamental liberty interest in the care, custody and management of their natural children, protected by the Fourteenth Amendment. *Santosky v. Kramer*, 455 U.S. 745, 745 (1982). The government "may not seize a child from his or her parents absent a court order, parental consent, or exigent circumstances." *Gates v. Texas Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 429 (5th Cir. 2008). Exigent circumstances are defined as reasonable cause to believe that a child is in imminent danger of physical or sexual abuse if they remain at the parental home. *Id.*

In cases of possible neglect, the Court considers the *Wernecke* factors: "(1) Available time to obtain a court order; (2) Risk that a parent might flee with the child; (3) Availability of less extreme solutions; (4) Any harm to the child that might arise from his removal; (5) Nature of the danger facing the child (its severity,

34

duration, frequency, and imminence); (6) Strength of the evidence supporting immediate removal; and (7) Presence or absence of parental supervision." *Banks v. Herbrich*, 90 F.4th 407, 413 (5th Cir. 2024).

On appeal, Appellants argue, with **absolutely no factual basis**, that "Dupuy knew that DCFS considered Ms. Carter a sufficient enough danger that she should not be allowed custody of her child from the school." Appellants' Brief at 34. This statement is obviously false.  It is undisputed that Dupuy never spoke to anyone from DCFS on the date of his use of force against Ms. Carter *and* Dupuy **"never viewed any order from DCFS or any court that would have permitted the school to keep G.C. from her parents' custody."** ROA.570.

Here, there was no court order, Ms. Carter did not consent to her daughter being removed from her custody, and there were no exigent circumstances. When the Live Oak secretary refused Ms. Carter's request to pick up her daughter, Ms. Carter expressed her concern that the school was kidnapping and holding G.C. hostage. ROA.566. In going to pick G.C. up from school on February 4, 2022, Ms. Carter was well within her right to request the release of her non-verbal developmentally disabled child.

Ms. Carter's presence on school property and her communications with school officials on February 4, 2022, were for a single clear purpose, which she articulated repeatedly: to simply pick up her daughter and bring her home. ROA.566. The

interactions she had with the Live Oak secretary were focused solely on her desire to pick up her daughter. ROA.566. When she first spoke to Dupuy, Ms. Carter voiced her desire to leave the school once she had her daughter. ROA.568. Ms. Carter's only reason for being present at the school that day and communicating with school officials, was to pick up her daughter, which was clearly well within her rights as a mother.

Dupuy's use of excessive force is even more egregious in light of the broader context of the parental rights at stake here. Where Ms. Carter assumed that a law enforcement officer would step in to prevent school administrators from unlawfully withholding her child from her, she instead met Dupuy, an officer who immediately, without any deliberation, unreasonably resorted to physical violence against her, the mother of a non-verbal developmentally disabled child.

## IV. A REASONABLE JURY COULD CONCLUDE THAT DUPUY USED EXCESSIVE FORCE IN VIOLATION OF MS. CARTER'S FOURTH AMENDMENT RIGHTS

To succeed in proving excessive force, a plaintiff must prove three elements: first, that there was an injury, second, that the injury resulted directly and only from a use of force that was clearly excessive, and third, that the excessiveness was clearly unreasonable. *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007) (citing *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)). An officer must assess the need for force and the relationship between the need and the amount of force used. *Deville,*

567 F.3d 156, 167. Where an individual is not under arrest and poses no threat to anyone, any use of force is unreasonable. *Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996). "'Ultimately, the touchstone is 'fair warning': The law can be clearly established 'despite notable factual distinctions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Crittindon v. LeBlanc*, 37 F.4th 177, 186 (5th Cir. 2022).

### a. Ms. Carter's Injuries Are Cognizable And Caused Directly And Only by Dupuy's Excessive Force

The district court correctly held that Ms. Carter's injuries are cognizable and a reasonable juror could find that the evidence shows the injuries were caused by Dupuy's excessive use of force. ROA.590-91. In an excessive force claim a plaintiff must prove that they suffered a cognizable injury. *Ikerd*, 101 F.3d at 434. The amount of injury necessary to satisfy the requirement for some injury is related to the amount of force constitutionally permissible under the circumstances. *Id.* at 434-5. A cognizable injury resulting from excessive force can include relatively minor physical injuries or psychological injuries. *Hanks,* 853 F.3d 738, 745. (plaintiff satisfied the injury requirement by alleging contusions, strains, and bruised ribs); *Hinson v. Martin*, 853 Fed.Appx. 926, 932 (5th Cir. 2021) (unpublished) ("… the relatively minor injury (pain)... from being kicked, when examined in the context… may suffice to meet the injury element of an excessive force claim, if objectively unreasonable"); *Flores v. City of Palacios*, 381 F.3d 391, 400 (5th Cir. 2004)

(holding that psychological injuries are sufficient to satisfy the injury element of a Fourth Amendment claim for excessive force).

The district court found that, properly construing the evidence in a light most favorable to Ms. Carter, there are at most "questions of fact about whether [Ms. Carter's] injuries were caused by Dupuy and not something else." ROA.590. A reasonable juror could conclude from the evidence that, as a result of Dupuy's use of excessive force, Ms. Carter suffered bruising on her upper arm, swelling, soreness, and tingling in her right wrist which required two visits to urgent care and three prescriptions. ROA.590-91. At most there is a factual dispute as to whether Dupuy's use of force caused Ms. Carter's injuries, and as such, summary judgment in favor of Appellants was improper on this question.

### b. Dupuy's Excessive Use of Force Was Unreasonable

As analyzed above, the application of all of the *Graham* factors here "weigh strongly in Mrs. Carter's favor." ROA.587. The violations of disturbing the peace and entry on or remaining in a place after being forbidden are both exceedingly minor crimes, evidenced by the fact that those charges were dropped without prosecution. The district court held that a reasonable jury could conclude that Ms. Carter did not pose a threat to anyone. ROA.587. Finally, Ms. Carter at most demonstrated passive resistance to Dupuy and certainly did not resist arrest or pose a flight risk. ROA.588.

Further, in *Barnes v. Felix*, the Supreme Court held that the "totality of the circumstances" that must be considered in determining the reasonableness of use of force, does not have any time limit:

> Prior events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening. Or instead they may show why such an officer would have perceived the same conduct as innocuous. The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force.

145 S. Ct. 1353, 1358 (2025). There is no dispute here that Dupuy escalated to using force "less than 20 seconds after first engaging with Mrs. Carter." ROA.589. Dupuy knew that there was a parent coming to the school to file a complaint against a teacher. ROA.564. Perhaps most importantly, Dupuy had not seen any court order or warrant related to a DCFS investigation, which would have prevented Ms. Carter from picking up her daughter. ROA.567. Given the totality of the circumstances here, Dupuy had no reason to perceive Ms. Carter as threatening and resort to use of force.

For those reasons, a reasonable jury could easily conclude that Dupuy's use of excessive force against Ms. Carter was unreasonable. The district court properly denied summary judgment to Defendants-Appellants.

## V.     MS. CARTER CAN PROCEED WITH HER STATE LAW CLAIMS

Ms. Carter brought state law claims of negligence, assault and battery against Dupuy and Sheriff Jason Ard. The district court sustained Ms. Carter's parallel state law claims "largely for the same reasons given for the federal excessive force claim." ROA.595. The district court relied on the standards laid out in *Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 381-83, to conclude that "a reasonable jury could easily conclude that the force used in this case was excessive and that Dupuy failed to act as a reasonably prudent officer." ROA.595.

### a. The District Court Properly Sustained Ms. Carter's State Law Claim for Negligent Use of Excessive Force

Louisiana Code of Criminal Procedure Article 220 dictates in part that "the person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained."

Under Louisiana law, excessive force constitutes negligence where a plaintiff can prove that "(1) the conduct in question was the cause-in-fact of the resulting harm; (2) [the] defendant owed a duty of care to plaintiff; (3) the requisite duty was breached by the defendant; [and] (4) the risk of harm was within the scope of protection afforded by the duty breached." *Harvey v. City of Eunice Police Dep't*, 2010-1228 (La. App. 3 Cir. 4/6/11), 62 So. 3d 290, 293 (quoting *Stroik v. Ponseti*, 96-2897 (La. 9/9/97), 699 So. 2d 1072, 1077). In effectuating an arrest, police

officers have a duty to act reasonably and limit use of force. *Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94), 646 So. 2d 318, 322. The question is whether, under the totality of the circumstances, the officer's conduct was unreasonable. *Watkins v. Gautreaux,*, 515 F. Supp. 3d 500, 518 (M.D. La 2021).

To determine whether there was a breach of duty resulting in unreasonable and excessive force, courts apply the factors outlined in *Kyle v. City of New Orleans*, 353 So.2d 969 (La. 1977). *Id.* Those factors include the known character of the individual being arrested, the risks and dangers facing the officer, the nature of the offense, the chance for the individual to escape if the means of force are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers as compared to the individual being arrested, and the exigency of the moment. *Kyle*, 353 So.2d at 973. Force may be necessary to make an arrest as a legitimate police function, but when the factors weigh toward unreasonable or excessive force, the officer and their employer are liable for resulting injuries. *Id.* at 972-3.

In its analysis as to the state law claims, the district court concluded, relying on the *Kyle* factors, that "the risk Dupuy faced was minimal, the offense involved was minor, there's no evidence that Mrs. Carter was a flight risk, Dupuy failed to employ alternate methods during the twenty-second encounter to ensure compliance (including continued negotiations), Dupuy did not believe Mrs. Carter possessed a

dangerous weapon, and the exigencies of the moment did not justify the use of force." ROA.595. This court should affirm the district court's ruling as to Ms. Carter's state law claims.

### b. Defendants Are Liable to Ms. Carter For Assault and Battery Because Deputy Dupuy Used Excessive Force.

Dupuy and Sheriff Ard are also liable to Ms. Carter for assault and battery because Dupuy used unreasonable force against Ms. Carter. Louisiana Civil Code Article 2315 creates liability for acts causing damages. Where the force used to effectuate an arrest is unreasonable, that force becomes an actionable battery claim and makes the officer and his employer liable for damages. *Patton v. Self*, 2006-1029 (La. App. 3 Cir. 3/7/07), 952 So. 2d 874, 878. A battery is a harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact. *Lombard v. Nobre*, 2023-0746 (La. App. 4 Cir. 6/18/24), 398 So. 3d 1, 10. An assault is the threat of a battery. *Lawson v. Straus*, 95-1537 (La. App. 4 Cir. 3/14/96), 673 So. 2d 223, 226, *writ denied*, 96-1709 (La. 9/3/96), 678 So. 2d 556. Where the *Kyle* factors determine that an officer used excessive force, there is a claim for battery. *Miller v. Vill. of Hornbeck*, 2010-1539 (La. App. 3 Cir. 5/11/11), 65 So. 3d 784, 789.

Given that the district court found, looking at the totality of the circumstances, a reasonable fact finder could conclude that Dupuy's use of force was inappropriate,

it denied Appellants' Motion for Summary Judgment as to these claims. ROA.595. This Court should do the same.

### c. The District Court Properly Sustained Ms. Carter's *Respondeat Superior* Claim Against Sheriff Ard.

The district court denied Appellants' motion for summary judgment as to Ms. Carter's claim against Sheriff Ard for vicarious liability. ROA.596. Louisiana Civil Code Article 2320 provides that "Masters and employers are answerable for the damages occasioned by their servants and overseers, in the exercise of the functions in which they are employed." Governmental entities, such as law enforcement employers, are subject to vicarious liability like every other employer. *Tutrix on behalf of DCJH v. Travis*, 595 F. Supp. 3d 488, 513–14 (M.D. La. 2022). An employee's conduct is considered within the course and scope of his employment if it is "of the character and nature that he is employed to perform, occurs substantially within the authorized limits of time and space, and is activated at least in part by a purpose to serve the employer." *Brasseaux v. Town of Mamou,* 1999-1584 (La. 1/19/00), 752 So. 2d 815, 820.

Here, there is no dispute that Dupuy was acting in the course and scope of his employment for Sheriff Ard at the time that he used force against Ms. Carter. The district court found that, "because there are questions of fact on Dupuy's liability, there are also questions of fact on [Ms. Carter's] vicarious liability claim against

Sheriff Ard." ROA.596. This Court should affirm the district court's ruling on Ms. Carter's claim against Sheriff Ard.

## VI. QUALIFIED IMMUNITY IS CONTRARY TO THE "NOTWITHSTANDING CLAUSE" OF THE ORIGINAL TEXT OF SECTION 1983

Ms. Carter argued in her opposition to Appellants' Motion for Summary Judgment that the doctrine of qualified immunity is contrary to the "notwithstanding clause" of the original language of Section 1983. ROA.383-91. The district court rejected Ms. Carter's argument quoting from its ruling in *Abshire v. Livingston Parish*, No. 22-548, 2023 WL 3589657 (M.D. La. May 22, 2023): "Plaintiffs' arguments are best left for the Supreme Court or the Fifth Circuit sitting en banc, not for a district court." ROA.591.

Ms. Carter reasserts here that this Court should find that abrogation of the doctrine of qualified immunity is appropriate, given the original language of Section 1983. As an alternative to the preceding arguments for denying qualified immunity to Appellants, Ms. Carter argues that the foregoing textual arguments also support a denial of qualified immunity.

### a. The Original Version of Section 1983 Contained a "Notwithstanding Clause" that Does Not Appear in Today's U.S. Code.

When Congress passes new legislation, it "does not write upon a clean slate." *United States v. Texas*, 507 U.S. 529, 534 (1993). Rather, it legislates against a backdrop of established "common-law adjudicatory principles." *Astoria Fed. Sav.*

& *Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). When Congress decides to craft a new law, it has a choice to make about the common law: it can either retain or reject the "long-established and familiar principles" in the common law. *Texas*, *supra*, 507 U.S. at 534. Courts assume that Congress chose to retain the common law unless the text of the statute says otherwise. *Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Va*., 464 U.S. 30, 35–36 (1983). It is thus the statutory text that decides whether common-law principles survive and apply to any particular statute.

Starting in 1967, the Supreme Court has assumed that Congress intended to retain common-law principles in actions under Section 1983. *Pierson v. Ray*, 386 U.S. 547, 557 (1967) ("We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983"). In *Pierson,* the Supreme Court examined the version of Section 1983 found in the U.S. Code (*id.,* fn. 1), and concluded that the "legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities" (*id*. at 554). Accordingly, the Court granted defendants a "defense of good faith and probable cause" that existed in Mississippi's common law. *Id*. at 557.

That evolved into the modern doctrine of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 806-807 (1982) ("As recognized at common law, public

officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability.").[3] The Supreme Court has explicitly relied on the supposed silence of Section 1983 to ground the doctrine.[4]

But the Supreme Court was wrong in 1967 when it assumed that Congress intended to incorporate the common law in Section 1983. The version of Section 1983 the Court looked at – the U.S. Code – <u>omits language originally passed by Congress</u>.

To see how, we have to go back to the origin of Section 1983.[5] The 42nd

---

[3] More recent scholarship has cast doubt on whether there actually was any generally available defense of good faith for constitutional claims or common law torts in 1871. *See* Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45, 55-57 (2018); Schwartz, Joanna C., *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797, 1801-1802 & nn.24- 26 (2018). And there is a growing cross-ideological body of criticism of the doctrine generally. *See, e.g., Ziglar v. Abbasi*, 137 S. Ct. 1843, 1870 (2017) (Thomas, J., concurring in part and concurring in the judgment) (noting his "growing concern with our qualified immunity jurisprudence"); *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (criticizing the Court's "one-sided approach to qualified immunity [which] transforms the doctrine into an absolute shield for law enforcement."). This brief does not rely on such doubt.

[4] *See, e.g., Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (holding that "[c]ertain immunities were so well established in 1871" that "Congress would have specifically . . . provided had it wished to abolish them."); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989) (relying on the presumption that the 42nd Congress "likely intended" for the common law to apply); *Briscoe v. Lahue*, 460 U.S. 325, 337 (1983) ("[W]e find no evidence that Congress intended to abrogate the traditional common-law witness immunity in § 1983 actions."); *Procunier v. Navarette*, 434 U.S. 555, 561 (1978) ("Although the Court has recognized that in enacting §1983 Congress must have intended to expose state officials to damages liability in some circumstances, the section has been consistently construed as not intending wholesale revocation of the common-law immunity afforded government officials."); *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976) ("The decision in *Tenney* established that §1983 is to be read in harmony with general principles of tort immunities and defenses, rather than in derogation of them."). For a more thorough treatment of the evolution of the doctrine of qualified immunity, *see* Reinert, *supra*, at 115 et seq.

[5] Section 1983 was originally located in the U.S. Statutes at Large of 1871-1873, ch. 22, § 1, 17 Stat. 13. It then moved to Section 1979 of the U.S. Revised Statutes (1878), then again to 8 U.S.C. § 43 (1925), and finally to 42 U.S.C. § 1983 (1952). This brief uses "Section 1983" to include this entire history.

Congress passed Section 1983 as part of the Ku Klux Klan Act of 1871. The original text of the statute was reflected in the Statutes at Large. That original version was longer than its contemporary U.S. Code counterpart. Rather than having just <u>two</u> relevant clauses, the original text had <u>three</u>. The first and third clauses are largely the same today as they were in 1871:

> That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall
>
> . . . be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress[.]
>
> Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871).

The original statute, however, contained "additional significant text" where the ellipsis appears above –"[i]n between the words 'shall' and 'be liable.'" *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 201, 235 (2023).

Between "shall" and "liable" was an additional clause. That clause said that government officials "shall, **any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding**, be liable" under the statute. Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) (emphasis added). That language can be seen in an authentic copy of the Civil Rights Act of 1871, certified by the National Archives and Records Administration on August 19, 2022.

ROA.488-495.

To determine the meaning of this long-forgotten "notwithstanding clause," this Court should look to the "ordinary public meaning…at the time of its enactment." *See Bostock v. Clayton County*, 590 U.S. 644, 654 (2020). Accordingly, the Court should evaluate two key phrases: (1) "custom[ ] or usage of the State," and (2) "to the contrary notwithstanding."

As understood by the 42nd Congress, a "usage or custom" was the common law itself. *Strother v. Lucas*, 37 U.S. 410, 437 (1838). Whether a rule was established by "usage" or through "custom," it existed by "a common right, which means a right by common law." *Id.*; *see also Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 659 (1834) ("The judicial decisions, the usages and customs of the respective states" established the "common law . . . in each [state]."); *Western Union Telegraph Co. v. Call Pub. Co.,* 181 U.S. 92, 102 (1901) (citing Black's Law Dictionary for proposition that common law springs from "usages and customs")*.*

The original text of Section 1983 also said that officials will be liable for constitutional violations "notwithstanding" any "contrary" common-law principles. The ordinary public meaning of "notwithstanding" remains the same today as it did for the 42nd Congress in 1871. *See Bryan A. Garner, Garner's Modern English Usage* 635 (4th ed. 2016) ("This usage [of notwithstanding] has been constant from the 1300s to the present day."). "Notwithstanding" means "[w]ithout opposition,

prevention, or obstruction from," or "in spite of." ROA.497 (citing Complete Dictionary of the English Language 894 (Webster's 1886))[6]; *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017) (explaining that the ordinary meaning of "notwithstanding" is "in spite of" or "without prevention or obstruction from or by"). Contemporaneous dictionaries confirm this meaning. ROA.506 (citing *Etymological Dictionary of the English Language* 344 (Chambers's 1874));[7] ROA.507 (citing *2 A New Dictionary of the English Language 1351* (1837)).[8] This plain-English understanding of the "Notwithstanding Clause" is consistent with the context. As Reinert observes, some of "the very same people who served in the rebel army were also serving as judges in southern states. It would have been passing strange, then, for the very same Congress to permit liability under Section 1983 to be limited by judge-made law created by state court judges." *Reinert*, 111 Calif. L. Rev. at 239.

In short: the "notwithstanding clause" means that the common law does not prevent persons from being held liable under Section 1983. *See id.* at 236. ("Its implications are unambiguous: state law immunity doctrine, however framed, has no place in Section 1983").

---

[6] Available                                    online                                    at https://archive.org/details/websterscomplete00webs/page/894/mode/2up?view=theater.
[7] Available at https://i2i.org/wp-content/uploads/2017/11/1874_Chambers_Etymological.pdf.
[8] Available online at https://babel.hathitrust.org/cgi/pt?id=chi.73004154&view=1up&seq=175.

### b. The removal of the "Notwithstanding Clause" in the Revised Statutes of 1874 did not change the substance of the law.

In determining what a law says, the current edition of the United States Code is "prima facie" evidence of the text of the law. *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 448 (1993), *citing* 1 U.S.C. § 204(a). But it is the original Statutes at Large that provide the actual "legal evidence of laws." *Id., quoting* 1 U.S.C. § 112; *see also United States v. Welden*, 377 U.S. 95, 98 n.4 (1964) ("the Code cannot prevail over the Statutes at Large when the two are inconsistent."), *quoting Stephan v. United States*, 319 U.S. 423, 426 (1943).

Relevant here, shortly after passing the Ku Klux Klan Act of 1871, the 43rd Congress compiled the Revised Statutes of 1874. Before the Revised Statutes, the country lacked an official compilation of federal laws. Lawyers often found themselves relying on newspapers or private compilations to figure out the law. Ralph H. Dwan & Ernest R. Feidler, *The Federal Statutes—Their History and Use*, 22 Minn. L. Rev. 1008, 1008–09 (1938). To address this, "President Andrew Johnson appointed a commission to revise, simplify, arrange, and consolidate all statutes of the United States." Shawn G. Nevers & Julie Graves Krishnaswami, *The Shadow Code: Statutory Notes in the United States Code*, 112 L. Library J. 213, 218 (2020) (internal quotation marks omitted). At its core, this compilation was organizational in design, as it put all existing federal laws in the same place for the first time.

But after years of trying, Congress was not satisfied with the results. Dwan & Feidler, 22 Minn. L. Rev. at 1013. It hired Thomas Jefferson Durant, a D.C. lawyer not involved in the initial drafting, to comb through the proposed revisions. ROA.508 (citing 2 Cong. Rec. 646 (1874)). Congress tasked Durant to strike out any provision that substantively changed the law, but to keep "mere changes of phraseology not affecting the meaning of the law." ROA.509 (quoting *id*. at 646, 648). For the latter, Congress understood that some changes had to be made. After all, it would be impossible to "condense seventeen volumes into one and use precisely the same words that have been used in those seventeen." ROA.510 (quoting *id*. at 1210 (remarks of Rep. Poland)); *see also* ROA.511 (*Id.* at 650 (remarks of Rep. Lawrence)). This meant that some language would be "necessarily changed." *Id*. But Congress intended "to preserve absolute identity of meaning" in the law. ROA.513 (quoting 2 Cong. Rec. 4220 (1874) (Sen. Conkling)). Indeed, as one representative stressed, "We have not attempted to change the law, in a single word or letter, so as to make a different reading or different sense." ROA.512 (quoting 2 Cong. Rec. 129 (1873)). Rather, when a change was made, that change, "however minute," was simply meant to condense the law. ROA.513 (quoting 2 Cong. Rec. 4220 (1874)). This was true for omissions, too, which the 43rd Congress viewed as a necessary tool "to strike out the obsolete parts and to condense and consolidate." ROA.512 (quoting 2 Cong. Rec. 129 (1873)). Such an omission did

not, however, substantively change the law.

Durant's revisions were passed by the 43rd Congress as the Revised Statutes in 1874, which later became the U.S. Code. But because the explicit intent of congress was to <u>not</u> change the substantive provisions of the law, **the omission of the "notwithstanding clause" in 1874 did not alter the 42d Congress's original decision to abrogate the common law from Section 1983**. *See United States v. Welden*, 377 U.S. 95, 98 fn.4 (1964) (when Congress decides to "revis[e] and consolidat[e] the laws," it does not change the effect of the law unless Congress explicitly says so.)

This approach matches the Court's presumption against implicit statutory changes. When Congress wants to repeal or change some part of a statute, it must do so with "clear and manifest" intent. *See Watt v. Alaska*, 451 U.S. 259, 266–67 (1981). In other words, to incorporate the common law *<u>back</u>* into Section 1983, the Revised Statues would have needed to include some form of positive text about the common law. *See* Reinert, 111 Calif. L. Rev. at 236 (explaining that the removal of the Notwithstanding Clause was "not the product of any positive lawmaking"). But that addition to the text never happened.[9] The Revised Statutes did not mention the

---

[9] There have been only two amendments to 42 U.S.C. §1983 over the course of the 151 years since its enactment. The first amendment, Pub. L. 96-170, §1, enacted on December 29, 1979, made certain that the District of Columbia was covered by 42 U.S.C. §1983. The second amendment, Pub. L. 104-317, title III, §309(c), addresses the availability of injunctive relief in cases against judicial officers.

common law. Nor did the 43rd Congress include language indicating that it was reversing the 42nd Congress' decision to excise the common law from Section 1983.

It makes sense, then, that the Supreme Court has already viewed the omission of two other "notwithstanding clauses" from other civil rights statutes as non-substantive changes to the law. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 422 (1968); *The Civil Rights Cases*, 109 U.S. 3, 16–17 (1883). In *Jones*, for example, the Supreme Court viewed the omission of another "notwithstanding clause" – in Section 1982 – as a non-substantive change. *Jones, supra,* 392 U.S. at 422 n.29. The Court recognized that the Section 1982 "notwithstanding clause" was "obviously inserted" to "emphasiz[e] the supremacy of the 1866 statute over inconsistent state or local laws." *Id*. And later, when "[i]t was deleted" in the Revised Statutes, the Court presumed the omission was just a decision to remove perceived "surplusage." *Id*.

So too with Section 1983. The 1871 Congress was explicit in legislating that persons can be held liable for Section 1983 violations in spite of any common law doctrines to the contrary. The omission of that language in 1874 did not change the impact of the law. The current doctrine of qualified immunity rests on the presumption that the 1871 statute was silent about the common law. But the statute was <u>not</u> silent – it explicitly rejected any common law defenses.

As the district court noted in *Abshire*, this "position certainly finds some support within the Fifth Circuit." No. CV 22-548-JWD-SDJ, 2023 WL 3589657, at *9 (M.D. La. May 22, 2023). (citing *Zadeh v. Robinson*, 928 F.3d 457, 480-81 (5th Cir. 2019) (Willett, J., dissenting in part)). Notably, Professor Alexander Reinert's above-referenced argument as to the textual evidence pointing to the fact that Congress intended to "nullify[ ] all common-law defenses against § 1983 actions," has been given some attention by this Court. *Rogers v. Jarrett*, 63 F.4th 971, 979 (5th Cir.), *cert. denied*, 144 S. Ct. 193, 217 L. Ed. 2d 79 (2023) (Willett, J., concurring).

Because the original text of the statute shows that the presumption was wrong, this Court should deny the application of qualified immunity here as Congress intended.

## CONCLUSION

The district court properly construed the evidence most favorable to Ms. Carter on Appellants' motion for summary judgment. The district court found that a reasonable jury could conclude that Dupuy's use of force was unreasonable, and he is not entitled to qualified immunity as a defense. As an alternative to the district court's reasoning, Ms. Carter argues that the original language of Section 1983 supports abrogation of the defense of qualified immunity. The district court further denied Ms. Carter's state law claims. Appellants have failed to show that the

district court improperly denied Dupuy qualified immunity. Thus, the district court's judgment should be sustained in all respects.

Respectfully Submitted,

By:/s/ Garret S. DeReus

**BIZER & DEREUS, LLC**
Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Eva M. Kalikoff (LA # 39932)
eva@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996
*Counsel of Record for Appellees*

***AND***

**CIRKIEL LAW GROUP, P.C.**
*Attorneys for Plaintiff*
Martin J. Cirkiel, Esq.
Texas Bar No. 00783829
1901 E. Palm Valley Blvd.
Round Rock, Texas 78664
marty@cirkielaw.com
T: 512-244-6658
F: 512-244-6014

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 7th day of August, 2025, service by Electronic Notice through the CM/ECF system was made upon the all counsel of record. I further certify that on this same date, a copy of this brief was served on the counsel of record for Defendants-Appellants via Electronic Mail:

By: <u>/s/ Garret S. DeReus</u>
**Garret S. DeReus**


## <u>CERTIFICATE OF COMPLIANCE</u>

**1.** This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,807 words, as determined by the word-count function of excluding the parts of the brief exempted by Fed. R. App. P.32(f).

**2.** This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

By: <u>/s/ Garret S. DeReus</u>
**Garret S. DeReus**


Dated: <u>August 7, 2025</u>